# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| COASTAL WELLNESS CENTER, INC., a Florida corporation, a/a/o Kelly Wyman, and TOTAL HEALTH CHIROPRACTIC, LLC, a Florida limited liability corporation, a/a/o Richard Fennell, on behalf of itself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>    Defendant.<br>_____ | Case No. 0:17-CV-61950-WPD |

## STATE FARM'S MOTION TO DISMISS

State Farm Mutual Automobile Insurance Company moves to dismiss with prejudice the amended complaint (D.E. 15) of plaintiffs Coastal Wellness Center, Inc. and Total Health Chiropractic, LLC (collectively, "plaintiffs") for failure to state a claim.

As plaintiffs acknowledge, State Farm's policy limits reimbursement for medical expenses based on maximum charges provided in the Florida Motor Vehicle No-Fault Law ("No Fault Law" or the "PIP statute"). D.E. 15, ¶ 35. For chiropractic services, the policies and the statute limit payment to 80 percent of 200 percent of the "allowable amount under the participating physicians fee schedule of Medicare Part B." State Farm made its payments to plaintiffs by looking to the price for chiropractic services under the physician fee schedule reflected in the payment files published by the Centers for Medicare and Medicaid Services ("CMS"), the federal agency that administers Medicare. Those amounts during the years 2010 to 2014 included a two percent reduction in prices for chiropractic services under the fee schedule.

Plaintiffs allege that State Farm's payments were in error. They assert that, instead of looking to the physician fee schedule payment file, State Farm was required to look to other values published by CMS, and then apply a formula found in the Federal Register, which does not incorporate the 2 percent reduction. Plaintiffs thus contend that State Farm paid them an "improperly reduced" amount.

As shown below, the linchpin of plaintiffs' argument is the assertion that the Medicare Part B participating physician fee schedule for chiropractic services was *not* reduced by two percent during the relevant years. That assertion is incorrect as a matter of law. It relies on a misreading of language in a CMS rule, which plaintiffs take out of context while ignoring dispositive language in the very same rule showing unequivocally that CMS made the two percent reduction in the physician fee schedule itself.

State Farm's position, in contrast, is supported by (a) the plain language of the PIP statute, (b) the language of the CMS rule, (c) Florida case law, and (d) the legislative purpose behind the PIP statute – to provide for swift, virtually automatic payment and minimum financial interruption to the insured. Since the physician fee schedule price for chiropractic services as published by CMS was reduced by two percent, State Farm properly used that reduced amount as the starting point for calculating its payments, rather deriving that starting point by using the formula urged by plaintiffs. Plaintiffs' claims therefore fail as a matter of law.

The grounds for this motion are explained further in the following memorandum of law.

**MEMORANDUM OF LAW**

I.   **Allegations of the Complaint**

State Farm sells auto insurance products, including No-Fault or PIP coverage, to automobile owners in Florida. D.E. 15, ¶ 6.[1]  Coastal and Total Health provide chiropractic services. *Id.* at ¶¶ 2, 4. Plaintiffs' principal places of business are in Broward County. *Id.* Plaintiffs provide chiropractic services to, among others, State Farm insureds who are involved in motor vehicle accidents, and plaintiffs obtain payment under the PIP coverage of State Farm's insurance policies pursuant to assignments of benefits by the insureds. *Id.* at ¶¶ 2-5, 15-16, 25-26.

On May 18, 2014 and July 3, 2014, respectively, State Farm's insureds sustained injuries in separate motor vehicle accidents. *Id.* at ¶¶ 13, 22. Plaintiffs provided chiropractic services to the insureds in connection with those injuries, and the insureds assigned their insurance benefits to plaintiffs. *Id.* at ¶¶ 16, 26. Plaintiffs billed State Farm for the treatments, using CPT code 98940[2] in their billing statements to describe the chiropractic services. *Id.* at ¶¶ 17-18, 27-28. Although each bill sought reimbursement in the amount of $65.00 for Coastal (3 times) and $70.00 for Total Health (twenty times), plaintiffs assert that the correct amount for each

---

[1] For purposes of this motion, the amended complaint's factual allegations are assumed to be true, but the Court is not required to accept legal conclusions or allegations contrary to facts of which the Court may take judicial notice. *See, e.g., Response Oncology, Inc. v. Metrahealth Ins. Co.*, 978 F. Supp. 1052, 1058 (S.D. Fla. 1997).

[2] CPT, or "Current Procedural Terminology" codes are issued by the American Medical Association and used to report medical procedures and services under public and private health insurance programs. Although the plaintiffs both billed State Farm using CPT code 98940, they also allege that other providers in the putative class billed State Farm under code 98941. D.E. 15, ¶ 56. The same legal argument, however, would apply to these chiropractic codes, since they were equally subject to Medicare's 2 % reduction in the physician fee schedule with respect to reimbursement for chiropractic services.

reimbursement was $46.51.  *Id.* at ¶¶ 18, 28.   Plaintiffs complain that in each instance State Farm paid them only $45.68, a difference of 2 percent.  *Id*.

## II.   Argument

### A.   Statutory Framework

State Farm made payments to plaintiffs pursuant to section 627.736(5), Florida Statutes, which both parties agree governs this case.  *See* D.E. 15, ¶¶ 18-19, 28-29, 32-36.[3]  The No-Fault Law is a statutory scheme designed to provide insurance benefits "without regard to fault, and to require motor vehicle insurance securing such benefits.'"  *Allstate Ins. Co. v. Holy Cross Hosp., Inc.*, 961 So. 2d 328, 332 (Fla. 2007); Fla. Stat. § 627.731.  The statute provides "swift and virtually automatic payment so that the injured insured may get on with his life without undue financial interruption."  *Allstate*, 961 So. 2d at 332 (citation omitted).  The statute permits policyholders seeking treatment from medical providers to assign their benefits under the insurance policies directly to the providers to further this aim.

As set forth above, for those insurers such as State Farm who elect to use it in their policies, the No-Fault Law establishes a fee schedule regime applicable to essentially all medical procedures.  *See* D.E. 15, ¶¶ 35-36, 47; Fla. Stat. § 627.736(5)(a)(1).[4]  Subsection (5)(a)(1) of the No-Fault Law, entitled "Charges for treatment of injured persons," states that an insurer "may limit reimbursement to 80 percent" of several listed "maximum charges."  Several of the enumerated "maximum charges" use the amount paid under the federal Medicare system as a starting point for calculating PIP insurance payments.

---

[3] Unless otherwise noted, references to and quotations from the Florida PIP statute are from the version in effect in 2014, also quoted by the plaintiffs in the amended complaint.

[4] The relevant policy provisions are set forth on pages 14-16 of the policies, copies of which are attached hereto as Exhibits A and B.  Where, as here, a document is central to plaintiff's allegations and its authenticity is undisputed, it may be considered on a motion to dismiss.  *See, e.g., Jones v. Prof. Fin. Co.*, 2017 WL 6033547, *2 (S.D. Fla. Dec. 4, 2017) ( Dimitrouleas, J.).

Specifically, since it is undisputed that the services at issue in this case were provided in a non-emergency, non-hospital setting, they fall within the "other medical services" described by subsection (5)(a)(1)(f). *See* D.E. 15, ¶ 36, 47. For such services, the No-Fault law provides that a provider is reimbursed "200 percent of the *allowable amount under . . . the participating physicians fee schedule of Medicare Part B . . . .*"[5] D.E. 15 ¶¶ 35-36, 47; Fla. Stat. § 627.736(5)(a)(1)(f).[6] In other words, the Florida PIP statute mandates that an auto insurer pay a provider almost *double* what Medicare provides under the participating physicians fee schedule.

In sum, the Florida Legislature explicitly directed that PIP insurers like State Farm consult the applicable schedule for Medicare Part B (hereinafter, "physician fee schedule" or "PFS") to price such services – even though PIP insurers like State Farm are not Medicare participating providers. Thus, although the Medicare Part B physician fee schedule was not created for PIP insurers such as State Farm, the Florida Legislature in the PIP statute nonetheless made a legislative policy choice to reference and apply that schedule as the starting point for payments to PIP insurers.

### B.  As A Matter of Law, State Farm Properly Calculated Its Payments To Plaintiffs, And The Complaint Therefore Fails To State A Claim.

All counts of the complaint are based on plaintiffs' allegation of "improperly reduced" payments. Those allegations, in turn, are based on plaintiffs' argument that State Farm, in determining the allowable amount under the Medicare Part B PFS for purposes calculating the payment limitation provided by the Florida PIP statute, should not have looked to the fee

---

[5] All emphasis in quotations is supplied unless otherwise indicated.
[6] The applicable fee schedule is the one in effect at the time and place where the services were rendered, and the schedule in effect as of March 1 continues to govern reimbursement for the entire service year (March 1 to the end of February). *See* Fla. Stat. § 627.735(5)(a)(2). The 2007 schedule operates as a floor for payments: the schedule for maximum charges for the current year must be compared to the schedule for 2007, and the higher of the two is to be used to calculate payments to the provider. *See id.*

5

schedule price for chiropractic services published by CMS, which incorporated a 2 percent reduction. Instead, plaintiffs allege, State Farm should have used a formula published in the Federal Register, and applied that formula to other values published by CMS, to derive the starting point for calculating its payments.

State Farm will show below that plaintiffs are wrong on that fundamental issue, but it will be helpful first to note the points on which the parties agree.

### 1.     Points On Which The Parties Agree

First, plaintiffs assert that the No Fault Law and the policies of insurance limit payments to 80 percent of 200 percent of the allowable amount under the participating physician fee schedule of Medicare Part B. D.E. 15, ¶¶ 19, 29, 35-37, 47-48. State Farm agrees.

Plaintiffs also allege that State Farm actually paid 80 percent of 200 percent of the amount listed for the relevant chiropractic code by CMS in Medicare "payment file." *See id*. at ¶¶ 18-19, 28-29, 42, 45-46, 53, Exh. D. State Farm agrees.

More specifically, the relevant payment file was the Physician Fee Schedule Payment Amount File. *See* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/PFS-National-Payment-Amount-File.html.[7] This file contains the "*Medicare price for all services priced under the Physician Fee Schedule*." *See* 69 FR 1084-01, 2004 WL 28462 (Jan. 7, 2004). Because the PIP statute defines the applicable service year for 2014 as starting on March 1, 2014,[8] the relevant payment amount file is PFALL14A (the

---

[7] The Court may take judicial notice of material set forth in government publications, including material set forth on websites. *See, e.g., Jones*, 2017 WL 6033547, *2; *United States ex rel. Fox RX, Inc. v. Omnicare, Inc.*, 38 F. Supp. 3d 398, 405-06 & n.6 (S.D.N.Y. 2014) (taking judicial notice of statements made on CMS website); *Abdus-Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3, 9-10 & n.3 (D.D.C. 2016) (taking judicial notice of Department of Health and Human Services manual explaining Medicare coverage and government healthcare website).

[8] As noted above, the PIP statute defines the term "service year" as "the period from March 1 through the end of February of the following year." Fla. Stat. § 627.736(5)(a)2.

January 2014 Release). For the specific locale at issue in this action (Broward County), that file sets forth an amount of $28.49 for CPT Code 98940. 200 percent of that amount, as provided by both the PIP statute and the Policy, is $56.98. *See* D.E. 15 Exh. B (Explanation of Review reflecting $56.98 as 200% of the Medicare Part B fee schedule amount). 80 percent of this amount, to be paid by the PIP insurer under the statute, is $45.58 for each instance of CPT Code 98940. This is precisely the amount plaintiffs allege State Farm paid. *See* D.E. 15, ¶¶ 18-19, 28-29, Exh. D.

There is also no disagreement that the amounts listed for chiropractic services in the CMS payment file incorporated a 2 percent reduction. This reduction was imposed by CMS to allow Medicare to recoup the cost of a study or demonstration regarding possible expansion of coverage for chiropractic services under Medicare, as required by the Medicare Prescription Drug, Improvement and Modernization Act ("MMA") of 2003. *See* D.E. 15, ¶¶ 39-45; Pub. L. 108-173 (2003).[9]

### 2. The Dispositive Issue, On Which The Parties Disagree

Plaintiffs assert, however, that the amounts published by CMS in the payment file, which incorporated the 2 percent reduction for chiropractic codes, do not reflect the physician fee schedule. *See* D.E. 15, ¶¶ 38, 42-46, 48-52. That is so, because, plaintiffs argue, the physician fee schedule did not incorporate the 2 percent reduction.

Thus, according to plaintiffs' reasoning, State Farm should not have used the amount set forth in the payment file to calculate its payments. *See id*. at ¶¶ 38, 43. Instead, they argue, State Farm should have looked to other values published by CMS - Relative Value Units, geographic

---

[9] The reduction derived from Section 651 of MMA, which authorized a demonstration to evaluate the feasibility and advisability of expanding Medicare coverage for chiropractic services, but also required that "budget neutrality" be maintained. *See* 74 FR 61738-01, 2009 WL 4057861, *61926-28 (Nov. 25, 2009). Hence, the need to recoup the cost of the demonstration. *Id.*

adjustments and "conversion factors" – even though those values are not referenced in the PIP statute. Plaintiffs allege that State Farm should have applied the formula published in the Federal Register (a formula also not referenced in the PIP statute), to arrive at a *different* amount (an amount not published by CMS as the fee schedule price) that was two percent higher than the amount CMS published as the price under the fee schedule. *See id.* ¶¶ at 50-51 & n.2.[10] State Farm, plaintiffs allege, under the PIP statute, should have paid plaintiffs 80 percent of 200 percent of *that* amount, rather than the lower amount State Farm paid. *Id.* at ¶¶ 45, 48.

As State Farm will show, plaintiffs' argument should be rejected and the amended complaint dismissed with prejudice.

### 3. State Farm Properly Calculated Its Payments.

#### a. State Farm Properly Relied On The Fee Schedule Price Published By CMS In The Physician Fee Schedule Payment File, Rather Than Engaging In Plaintiffs' Proposed RVU Computation.

This case turns on interpretation of the PIP statute's language. As the Florida Supreme Court declared: "Where the wording of the law is clear and amenable to a logical and reasonable interpretation, a court is without power to diverge from the intent of the Legislature as expressed in the plain language.... " *Allstate*, 961 So. 2d at 334 328, 334 (Fla. 2007) (citations omitted). As with any statute, "[t]he plain meaning of the statutory language is the first consideration." *St. Petersburg Bank & Trust Co. v. Hamm,* 414 So. 2d 1071, 1073 (Fla. 1982).

---

[10] Plaintiffs specifically propose that State Farm employ the following formula to calculate the allowable amount: [(RVU Work x  GPCI Work) + (RVU PE x GPCI PE) + (RVU MP x GPCI MP)] x Conversion Factor.  GPCI refers to Geographic Pricing Cost Index.  PE refers to practice expense.  MP refers to malpractice.  Plaintiffs have obtained this alternative methodology from an edition of the Federal Register.  *See* D.E. 15,  ¶¶ 50 n.2  (citing 62 FR 59050-51 (1997)). Based on the amount derived from this formula – which is *not* the amount provided by the applicable PFS for Medicare Part B – plaintiffs contend that the appropriate payment amount was  $46.51 for each instance of CPT Code 98940.

The key statutory language here is: "the allowable amount under the participating physicians fee schedule."

First, the plain meaning of "physicians fee schedule:" a schedule is by definition a list. *See, e.g., Black's Law Dictionary* 1546 (10th ed. 2014); *Webster's New Collegiate Dictionary* 1110 (11th ed. 2003); *Barco v. School Bd. of Pinellas County,* 975 So. 2d 1116, 1122 (Fla. 2008) (reference to the dictionary is appropriate to determine ordinary meanings). In particular, a fee schedule is a list of maximum fees for services. As the CMS website explains, "a fee schedule is a complete listing of fees used by Medicare to pay doctors or other providers/suppliers. This comprehensive listing of maximum fees is used to reimburse a physician and/or other providers on a fee-for-service basis."[11]

It follows that the "physicians fee schedule" referenced in the PIP statute is not, as plaintiffs would have it, a formula set forth in the Federal Register that may bear on the creation of the list of fees; the "schedule" – the only thing referred to in the Florida PIP statute – is the list of fees itself. *See All Family Clinic of Daytona Beach, Inc. v. State Farm Mut. Auto. Ins. Co.*, 685 F. Supp. 2d 1297, 1302 (S.D. Fla. 2010) (rejecting insurers' argument on the ground that it conflated the fee schedule itself with the statute that establishes it), *aff'd*, 448 Fed. Appx. 906 (11th Cir. 2011).

Second, the "allowable" amount under the PFS means the amount that is "permitted," or "not forbidden," or "not improper." *See, e.g.*, *Sharp v. United States*, 14 F.3d 583, 587 (Fed. Cir. 1993) (citing Webster's Third New International Dictionary (1986)).

Thus, by directing State Farm to consult the allowable amount under the fee schedule, the PIP statute by its plain terms directed State Farm to consult the published list of maximum fees

---

[11] See www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/FeeScheduleGenInfo/index.html

9

used to pay Medicare providers under the PFS.  Under the plain meaning of the PIP statute, those amounts are the allowable amounts under the PFS.  Nothing in the PIP statute remotely suggests that State Farm was required to look up the multiple, discrete values such as RVUs, and then apply the formula set forth in the Federal Register (but not referenced in the PIP statute), to reach an amount that is different from the actual fee schedule price published by CMS.

Plaintiffs' argument would effectively require State Farm to create another fee schedule, with amounts 2 percent higher than the one CMS actually published. Plaintiffs' argument is contrary to the plain meaning of the PIP statute and should be rejected.  *Allstate*, 961 So. 2d at 334 (courts may not "diverge from the intent of the Legislature as expressed in the plain language") (citation omitted); *Anderson Columbia v. Brewer*, 994 So. 2d 419, 420 (Fla. 1st DCA 2008) (courts are not to "add, subtract, [or] distort the words the Legislature has written") (citation omitted).

Further, also contrary to plaintiffs' position, the 2 percent reduction was manifestly *a reduction in the physician fee schedule itself.*  CMS itself made this clear, in portions of the same rule that plaintiffs rely on (although they omit the relevant language).  Because the CMS's own statements fatally undermine the plaintiffs' argument, State Farm quotes the relevant language here in full, with key language highlighted:

> In the CY 2006, 2007, and 2008 PFS final rules with comment period (70 FR 70266, 71 FR 69707, 72 FR 66325, respectively), we included a discussion of the strategy that would be used to assess BN [budget neutrality] and the method for adjusting chiropractor fees in the event the demonstration results in costs higher than those that would occur in the absence of the demonstration. We stated BN would be assessed by determining the change in costs based on a pre-post comparison of Medicare costs for beneficiaries in the demonstration and their counterparts in the control groups and the rate of change for specific diagnoses that are treated by chiropractors and physicians in the demonstration sites and control sites. We also stated that our analysis would not be limited to only review of chiropractor claims because the costs of the expanded chiropractor services may have an impact on other Medicare costs. *If the demonstration was not budget*

10

*neutral, we anticipated making **reductions in the CY 2010 and CY 2011 physician fee schedules.***

\* \* \*

. . . Users of chiropractic services are most likely to have been affected by the expanded coverage provided by this demonstration. Cost increases and offsets, such as reductions in hospitalizations or other types of ambulatory care, are more likely to be observed in this group. Therefore, as proposed, *we are adjusting the Medicare PFS [physician fee schedule]* for all chiropractors using the estimate provided in the "Chiropractic User Analysis." The CMS Office of the Actuary (OACT) estimates chiropractic expenditures in CY 2010 to be approximately $487 million based on actual Medicare spending for chiropractic services for the most recent available year. Because the costs of this demonstration were higher than expected and we did not anticipate *a reduction to the PFS* of greater than 2 percent per year, we are finalizing our proposal (74 FR 33639 through 33640) to recoup the $50 million in expenditures from this demonstration over a 5-year period rather than over a 2-year period. As proposed, *we are recouping $10 million each year through **adjustments to the PFS [physician fee schedule]** for chiropractic codes in calendar years 2010 through 2014.* This approach reflects a change from our BN discussion in the CY 2006, 2007, and 2008 PFS rules, which was described previously in this section. In those rules, we had proposed that if the adjustment for BN was greater than 2 percent of spending for the chiropractor fee schedule codes, the adjustment would be implemented over a 2-year period. *Under this final rule, we are recouping costs by **reducing payment under the PFS** for chiropractic fee codes by $10 million each year starting CY 2010 through CY 2014.* We note that in the proposed rule, we proposed a 2 percent reduction in the chiropractic fee codes in order to achieve the $10 million yearly recoupment. We note that 2 percent was an approximation. Because of rounding, the $10 million recoupment in each of CYs 2010 through 2014 will amount to approximately a 2 percent reduction since the reduction in the chiropractic fee codes may be slightly higher or lower than 2 percent, depending on OACT's estimate of chiropractic expenditures for that calendar year. In order to reflect this fact, we are refining the language in this final rule to indicate that *the chiropractic fee codes will be reduced by approximately 2 percent for CYs 2010 through 2014*. Additionally, we believe that spreading this adjustment over a longer period of time will minimize its potential negative impact on chiropractic practices.

**3. Payment Adjustment**

To implement the required BN adjustment, as was proposed (74 FR 33640), *we are **reducing the payment amount under the PFS** for the chiropractic CPT codes (that is, CPT codes 98940, 98941, and 98942)*. As explained previously, we are finalizing our plans to recoup $10 million each year through **adjustments to chiropractic CPT codes** for calendar years 2010 through 2014. *In order to achieve the $10 million recoupment during such years, **payment***

11

> *under the PFS for these codes will be reduced by approximately 2 percent. As stated in prior PFS rules, application of the BN* **[budget neutrality]** *adjustment would be specific to these three codes which represent the "chiropractic fee schedule" because they are the only chiropractic codes recognized under the PFS.* This methodology also appropriately impacts the chiropractic profession that is directly affected by the demonstration. . . .

74 FR 61738-01, 2009 WL 4047861, *61926-27 (Nov. 25, 2009).

As the highlighted language shows, CMS, pursuant to its statutory authorization to conduct the demonstration but ensure budget neutrality, recouped the cost of that demonstration by changes to the physician fee schedule itself. Accordingly, the language of the PIP statute and the language of the CMS final rule make clear that the amounts paid by State Farm, based on the PFS price shown in the payment file published by CMS that reflected the two percent reduction, were the proper amounts under the PIP statute and the insurance policies.

### b.    The CMS Rule Plaintiffs Rely On Refutes Their Position.

Ignoring the foregoing language from the CMS rule, plaintiffs attempt to support their position by pointing to an out-of-context snippet of language from the same rule:

> Consistent with the proposed rule, for this final rule with comment period, we are reflecting this reduction only in the payment files used by the Medicare contractors to process Medicare claims rather than through adjusting the RVUs. Avoiding an adjustment to the RVUs would preserve the integrity of the PFS, particularly since many private payers also base payment on the RVUs. The RVUs published in Addendum B and posted on our Web site will not show this reduction but will be annotated to state that the reduction resulting from the chiropractic demonstration is not reflected in the RVUs.

*Id.* at *61927; *see* D.E. 15, ¶ 42. Based on this quotation, plaintiffs make two arguments, neither of which has merit.

**First**, plaintiffs assert that CMS did not impose the 2 percent reduction in the fee schedule itself. D.E. 15, ¶ 43. This is the linchpin of plaintiffs' case, but it is demonstrably wrong. The language of the CMS rule extensively quoted above-language omitted by plaintiffs

12

in their amended complaint – shows that CMS did in fact apply the 2 percent reduction to the fee schedule itself.  The language quoted by plaintiffs does not say otherwise; in fact, it says the opposite, since it refers to "this reduction," which in context refers to a reduction in the fee schedule.  CMS thereby expressly distinguished between the physician fee schedule, which was being changed, and the RVUs, which were not being changed.  That the *RVUs* were not being changed is irrelevant under the PIP statute, which does not refer to RVUs or other components or calculations, but only to the physician fee schedule itself.

**Second**, plaintiffs argue that the quoted language shows that the "intent" of CMS was that private insurers not use the 2 percent adjustment.  *Id.* at ¶ 46.  But the quoted language says nothing about CMS's intent with respect to what private payers do or do not do with the information CMS was providing.  It says only that CMS is not changing the RVU's, because private payers rely on the RVUs in computing their payments.

In all events, the "intent" of CMS with respect to what one or more "private payers" do with the RVU values or anything else is irrelevant.  State Farm is not "private payer."  It is an auto insurer subject to the requirements of the Florida No-Fault Law, and it is the intent of the Florida legislature, not CMS, that controls, an intent revealed in the plain language and scheme of the Florida PIP statute.  As shown above, the PIP statute says nothing about RVU's or other components; it directs PIP insurers to calculate their payments based on the allowable amount under the Medicare Part B physician fee schedule.

Plaintiffs' related argument that State Farm improperly treated their claims "as if they were Medicare claims" should also be rejected.  *Id.* at ¶ 45.  Florida law, not State Farm, dictated that State Farm look to the allowable amount under the Medicare PFS.  Moreover, under the PIP statute, the Medicare fee schedule amount is not the amount State Farm *paid*, but merely a

starting point for its payment calculation. As required by Florida law and its policies, State Farm properly took that amount, doubled it, and paid 80 percent of that doubled amount.

### c. State Farm's Position Is Consistent With Case Law Interpreting Florida's PIP Statute.

Start Farm's position is also supported by the results in Florida PIP cases involving reimbursement of MRI providers. *See Nationwide Mut. Fire Ins. Co v. AFO Imaging, Inc*., 71 So. 3d 134 (Fla 2d DCA 2011); *All Family Clinic.,* 685 F. Supp. 2d at 1301-03. In those cases, as here, the Florida statutory language posited as a starting point for calculating PIP payments the "allowable amount under the participating physicians [fee] schedule of Medicare Part B." *All Family Clinic*, 685 F. Supp. 2d at 1297.

The insurers in those cases (including State Farm) argued that under provisions of the Medicare statute, the amount paid to MRI providers was to be determined by looking at the amount provided under the Outpatient Department schedule under the Outpatient Prospective Payment System ("OPPS"). *Id.* at 1301-02; *Nationwide*, 71 So. 3d at 135-37. Under the Medicare statute, if the amount under OPPS was less than the physician fee schedule amount, then the OPPS amount was substituted for the fee schedule amount in making the payment. *All Family Clinic*, 685 F. Supp. 2d at 1302. The insurers in those cases argued that under the PIP statute, this substituted amount should be used as the allowable amount under the physician fee schedule, and therefore used in their payment calculations. *Id.* at 1301-02.

The courts disagreed, ruling that the OPPS amount was drawn from a "different," "additional," "distinct and separate" fee schedule, which was created independently of the PFS and listed amounts different from the PFS. *All Family Clinic*, 685 F. Supp. 2d at 1301-02; *Nationwide*, 71 So. 3d at 137-38. This different schedule, in contrast to the PFS, was not referenced in the PIP statute. *Id*. Accepting the insurers' argument, the Southern District ruled,

14

would require PIP insurers to perform a calculation that compared the OPPS amount to the physician fee schedule amount, and if the OPPS amount was less, using that amount in determining its payments.  *All Family*, 685 F. Supp. 2d at 1302.  This would rewrite the PIP statute, which mandates use of the allowable amount under the physician fee schedule.  *Id.*

Yet here, plaintiffs effectively demand that State Farm do the very thing those cases forbid – ignore the actual fee schedule price as set forth in the payment file, and instead perform a calculation not referenced in the PIP statute, based on other values not set forth in the PIP statute, in order to determine a different amount from that applicable under the fee schedule that *is* referenced in the PIP statute.  Under *Nationwide* and *All Family Clinic*, this argument should be rejected.

### d. State Farm's Position Is Consistent With The Goals Of The PIP Statute.

State Farm's reading is not only supported by the plain language of the statute, by the CMS rule, and by the case law, but also by the legislative purposes behind the PIP statute.  *See Edwards v. Thomas*, _ So. 3d _, 42 Fla. L. Weekly S870, 2017 WL 4837631, *5  (Fla. Oct. 26, 2017) (court may resolve any ambiguity by applying rules of construction and looking to legislative history and the purpose behind the statute).

The PIP statute seeks to provide swift, virtually automatic payment.  *E.g., Allstate*, 961 So. 2d at 332.  State Farm's reading allows an easy and certain ascertainment of the amount to use as a starting point to calculate the payment.  Use of the applicable payment file for the PFS of Medicare Part B serves that goal – by providing an easily ascertainable and publicly available source for payment maintained by CMS.  Plaintiffs' RVU analysis, in contrast, argues for a far more convoluted approach that would bog PIP insurers down with a laborious and complex mathematical equation.

15

Plaintiffs' approach also is inconsistent with another goal of the No-Fault Law—minimizing the financial disruption to the accident victim. *Id.* Under plaintiffs' approach, insurers such as State Farm will end up paying more of the statutorily mandated $10,000 PIP benefit to chiropractic service providers. Rather than conserving PIP benefits, it would result in the earlier exhaustion of those benefits. In other words, because plaintiffs' approach requires greater payouts to chiropractic providers, it minimizes the amount of money available to injured insureds to pay for other medical services. The fact that a higher reimbursement sum is paid to a chiropractor who treats the insured leaves less of the limited PIP benefit available to pay other treating providers.

Plaintiffs' approach would also require an increase in the payment amounts insureds would be forced to pay out of their own pockets. That is so because the statute binds the insurer and insured together by the same payment structure. Insurers are responsible for 80% of reimbursable charges, and the insured patients remain responsible for the other 20%, but are protected from balance billing. Fla. Stat. § 627.736(5)(a)(1), (a)(4). Thus, if the amount insurers are required to reimburse providers increases, there is a concomitant increase in the amount owed by the insured.

Plaintiffs' position therefore places them in direct conflict with State Farm's insureds from whom they received the assignment of benefits and in whose shoes they stand. But this is contrary to the canon of statutory construction that the provisions of Florida's No-Fault Law must be construed liberally in favor of the insured. *See Government Employees Ins. Co. v. Novak,* 453 So. 2d 1116, 1119 (Fla. 1984); *Stewart v. Allstate Ins. Co.,* 618 So. 2d 771, 773 (Fla. 5th DCA 1993); *Hunter v. Allstate Ins. Co.,* 498 So. 2d 514, 516 (Fla. 5th DCA 1986).

\* \* \*

In sum, contrary to plaintiffs' position, CMS reduced the Medicare Part B participating physician fee schedule for chiropractic codes by 2 percent from 2010 to 2014.  The Florida PIP statute directs insurers to calculate their payments based on the amounts in that schedule.  That is precisely what State Farm did.

Accordingly, as all counts of the amended complaint - for declaratory relief (Count I), injunctive relief (Count II) and breach of contract damages (Count III) - are based on plaintiffs' allegations of improperly reduced payments, the amended complaint in its entirety should be dismissed with prejudice.

### C. Counts I and II Also Fail To State A Claim For Declaratory Or Injunctive Relief.

The claim for declaratory relief should also be dismissed for the additional reason that it simply duplicates plaintiffs' deficient breach of contract claim.  *See Marotto v. Scottsdale Ins. Co.*, 2008 WL 2952830, *1-2 (M.D. Fla. July 30, 2008); *Pierce v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 7671718, *5 & n.7 (S.D. Fla. Dec. 17, 2014) (court may dismiss declaratory judgment count as superfluous where resolution of other claims will resolve the disputed issues).

The counts for declaratory and injunctive relief similarly fail to set forth any facts plausibly showing that plaintiffs' remedy at law for breach of contract damages would be inadequate if their position on the fundamental legal issue discussed above were correct, particularly given that the 2 percent reduction in the fee schedule at issue here was only in effect from 2010 to 2014.  *See, e.g.*, *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 F. App'x 502, 503-04 (11th Cir. 2007); *Virga v. Progressive Am. Ins Co.*, 215 F. Supp. 3d 1320, 1323 (S.D. Fla. 2016); *Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*, 789 F. Supp. 2d 1311, 1318 (S.D. Fla. 2011) (dismissing injunctive relief claim in PIP benefits case because "[e]xisting legal remedies will adequately 'vindicate'

Plaintiff's rights should Defendants be found liable," and that " a determination in this case that applying the MMDIR is improper, costing State Farm money and setting precedent, will protect future claimants").

## CONCLUSION

For all the foregoing reasons, State Farm's motion to dismiss should be granted, and the amended complaint dismissed with prejudice.

Dated: December 15, 2017                        Respectfully submitted,

/s/ Benjamine Reid
Benjamine Reid
Fla. Bar No. 183522
Stephanie A. Fichera
Fla. Bar No. 55813
CARLTON FIELDS JORDEN BURT, P.A.
100 S.E. Second Street, Suite 4200
Miami, Florida 33131
Telephone: (305) 530-0050
Facsimile:  (305) 530-0055
E-mail: breid@carltonfields.com
E-mail: sfichera@carltonfields.com

D. Matthew Allen
Florida Bar No. 866326
E. Kelly Bittick, Jr.
Florida Bar No. 654035
CARLTON FIELDS JORDEN BURT, P.A.
Corporate Center Three
at International Plaza
4221 W. Boy Scout Boulevard
Suite 1000
Tampa, FL 33607
Telephone:     (813) 223-7000
Facsimile:      (813) 229-4133
E-mail:  mallen@carltonfields.com
Email: kbittick@carltonfields.com
***Attorneys for Defendant State Farm Mutual Automobile Insurance Company***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of December, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *D. Matthew Allen*
Attorney